<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

VANCE NORTON; GARY JENSEN;
KEITH CAMPBELL; ANTHONEY
BYRON; BEVAN WATKINS; TROY
SLAUGH; DAVE SWENSON; JEFF
CHUGG; REX OLSEN; CRAIG YOUNG;
SEAN DAVIS,

     Plaintiffs - Appellees,

v.

UTE INDIAN TRIBE OF THE UINTAH
AND OURAY RESERVATION, a
federally recognized Indian Tribe;
BUSINESS COMMITTEE FOR THE UTE
TRIBE OF THE UINTAH AND OURAY
RESERVATION, in its official capacity;
UTE TRIBAL COURT OF THE UINTAH
AND OURAY RESERVATION;
HONORABLE WILLIAM REYNOLDS,
in his official capacity as Acting Chief
Judge of the Ute Tribal Court; DEBRA
JONES, individually and as the natural
parent of Todd R. Murray and as personal
representative of the Estate of Todd R.
Murray; ARDEN POST, individually and
as the natural parent of Todd R. Murray,

    Defendants - Appellants.

No. 15-4170

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:15-CV-00300-DB)**
_____

Jeffrey S. Rasmussen (Thomas W. Fredericks, Frances C. Bassett, and Jeremy J. Patterson, with him on the briefs), Fredericks Peebles & Morgan, Louisville, Colorado for Defendants-Appellants.

Jesse C. Trentadue (Britton R. Butterfield, with him on the brief), Suitter Axland, PLLC, Salt Lake City, Utah, for Anthoney Byron, Bevan Watkins, Gary Jensen, Keith Campbell, Troy Slaugh, and Vance Norton, Plaintiffs-Appellees.

J. Clifford Petersen, Assistant Utah Attorney General (Scott D. Cheney, Assistant Utah Attorney General, and Sean D. Reyes, Utah Attorney General, with him on the brief), Office of the Attorney General for the State of Utah, Salt Lake City, Utah, for Craig Young, Dave Swenson, Jeff Chugg, Rex Olsen, and Sean Davis, Plaintiffs-Appellees.

———————————————————

Before **LUCERO**, **McKAY**, and **BACHARACH**, Circuit Judges.

———————————————————

**LUCERO**, Circuit Judge.

———————————————————

This appeal arises from the death of Todd Murray, a Ute tribal member, following a police pursuit on the Uintah and Ouray Indian Reservation (the "Reservation"). Murray's parents, his estate, and the Ute Indian Tribe (the "Tribal Plaintiffs") sued the officers involved in Ute Tribal Court (the "Tribal Court") for wrongful death, trespass, and other torts. The officers then filed suit in federal court against the Tribe, its Business Committee, the Tribal Court, the Acting Chief Judge of the Tribal Court, and the other Tribal Plaintiffs. The district court enjoined the Tribal Court action, holding that Nevada v. Hicks, 533 U.S. 353 (2001), bars tribal civil jurisdiction over the officers, making exhaustion of tribal court remedies unnecessary. It further determined that certain defendants were not entitled to tribal sovereign immunity.

2

We conclude that the district court erred in excusing the officers from exhaustion of tribal remedies with respect to the Tribe's trespass claim, which alleges that the officers asserted superior authority over tribal lands and barred a tribal official from accessing the scene of the Murray shooting. Although we do not decide today whether the Tribal Court possesses jurisdiction over that claim, exhaustion is required unless tribal court jurisdiction is "automatically foreclosed." Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians, 471 U.S. 845, 855 (1985). The officers have not made this showing for the trespass claim because that claim at least arguably implicates the Tribe's core sovereign rights to exclude and to self-govern. We further conclude that this claim is not barred by Hicks, which excused exhaustion based on a state's overriding interest in investigating off-reservation offenses. Such an interest is not at play in this case. Murray was not suspected of committing any off-reservation violation, and the officers were not cross-deputized to enforce state law on the Reservation. However, we agree with the district court that the remaining Tribal Court claims are not subject to tribal jurisdiction and thus exhaustion was unnecessary.

We also affirm the district court's conclusion that the Acting Chief Judge of the Tribal Court is not protected by tribal sovereign immunity under the doctrine of Ex Parte Young, 209 U.S. 123 (1908). But we reverse the district court's denial of tribal sovereign immunity as to the Tribe, its Business Committee, and the Tribal Court. Under Ex Parte Young, officials are subject to claims for prospective relief,

3

but the doctrine does not apply to governments and their subdivisions.  See Buchwald v. Univ. of N.M. Sch. of Med., 159 F.3d 487, 496 (10th Cir. 1998).

Exercising jurisdiction under 28 U.S.C. §§ 1291 and 1292(a)(1), we vacate in part and remand for further proceedings.

**I**

Todd Murray, a Ute tribal member, died on April 1, 2007, following a police pursuit.  Murray was a passenger in a vehicle that Utah State Trooper Dave Swenson attempted to stop for speeding near to, but outside of, the Reservation.  Uriah Kurip, the driver, failed to stop and turned onto the Reservation.  After an approximately thirty-minute chase, the vehicle ran off the highway and Kurip and Murray jumped out.  Swenson exited his patrol car with his gun drawn and ordered Kurip and Murray to the ground.  Kurip and Murray fled in opposite directions.  Swenson apprehended Kurip quickly without further incident.

Shortly after Swenson returned to his vehicle with Kurip, Vernal City Police Officer Vance Norton, Utah Highway Patrol Trooper Craig Young, and Uintah County Deputy Anthoney Bryon arrived on the scene.  None of these officers, including Swenson, were cross-deputized to exercise law enforcement authority on the Reservation.  When the additional officers arrived, they began searching for Murray.  Norton pursued Murray over tribal trust lands located more than twenty-five miles within the Reservation.  After finding Murray, Norton ordered him to the ground but Murray did not obey.  Norton fired two shots toward Murray.  Murray died from a gunshot wound to the head.  The parties disagree whether Murray shot

4

himself or was shot by officers. Raymond Wissiup, a Ute tribal member and certified law enforcement officer, arrived shortly thereafter, but the officers prevented him from accessing the scene.

In 2009, Murray's parents and his estate filed suit in state court against the officers and their employers, asserting common law torts and claims under 42 U.S.C. § 1983. After the suit was removed to federal court, the district court granted summary judgment in favor of the officers on the § 1983 claims and declined to exercise supplemental jurisdiction over the state law claims. We affirmed in Jones v. Norton, 809 F.3d 564 (10th Cir. 2015).

While that appeal was pending, Murray's parents, his estate, and the Tribe sued the officers in Tribal Court, solely asserting tort claims. The officers then filed suit in federal district court against the Tribe, its Business Committee, the Tribal Court, William Reynolds in his official capacity as Acting Chief Judge of the Tribal Court, and Murray's parents.[1] They moved for a preliminary injunction to halt the Tribal Court action. Reynolds and the Tribal Court moved to dismiss based on failure to exhaust Tribal Court remedies and sovereign immunity. The Tribe and its Business Committee filed a separate motion to dismiss, contending that all of the arguments set forth in the prior motion applied with equal force and service was improper.

---

[1] The original complaint was filed by the county and city officers; the state officers subsequently intervened as plaintiffs.

Both motions to dismiss were denied and the officers' motion for a preliminary injunction was granted by the district court. It concluded that the Tribal Court clearly lacked civil jurisdiction over the officers, and thus exhaustion of tribal court remedies was not required. The court further held that service was proper. Regarding sovereign immunity, the court analyzed the issue only with respect to Reynolds and the Tribal Court, ruling that those two parties were not immune from suit. This timely appeal followed.

## II

We review a district court's grant of a preliminary injunction for abuse of discretion. Dine Citizens Against Ruining Our Env't v. Jewell, 839 F.3d 1276, 1281 (10th Cir. 2016). In conducting this analysis, we review "the district court's factual findings for clear error and its conclusions of law de novo." Fish v. Kobach, 840 F.3d 710, 723 (10th Cir. 2016). In granting a preliminary injunction, the district court concluded that the officers were not required to exhaust tribal remedies because it is "clear that the tribal court lacks jurisdiction." Burrell v. Armijo, 456 F.3d 1159, 1168 (10th Cir. 2006). "[T]he proper scope of the tribal exhaustion rule" is a legal issue we review de novo. Kerr-McGee Corp. v. Farley, 115 F.3d 1498, 1501 (10th Cir. 1997).

"[F]ederal courts typically should abstain from hearing cases that challenge tribal court jurisdiction until tribal court remedies, including tribal appellate review, are exhausted." Crowe & Dunlevy, P.C. v. Stidham, 640 F.3d 1140, 1149 (10th Cir. 2011) (quotation omitted). This rule is grounded in federal policies supporting tribal

6

sovereignty, including: "(1) furthering congressional policy of supporting tribal self-government; (2) promoting the orderly administration of justice by allowing a full record to be developed in the tribal court; and (3) obtaining the benefit of tribal expertise if further review becomes necessary." Kerr-McGee, 115 F.3d at 1507 (citing Nat'l Farmers, 471 U.S. at 856-57). Because "the existence and extent of a tribal court's jurisdiction will require a careful examination of tribal sovereignty [and] the extent to which that sovereignty has been altered, divested, or diminished . . . that examination should be conducted in the first instance in the Tribal Court itself." Nat'l Farmers, 471 U.S. at 855-56; see also Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 16 (1987) ("[R]espect for tribal legal institutions requires that they be given a full opportunity to consider the issues before them and to rectify any errors." (quotations omitted)).

As a prudential rule based on comity, the tribal exhaustion requirement is subject to several exceptions:

> (1) where an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith; (2) where the tribal court action is patently violative of express jurisdictional prohibitions; (3) where exhaustion would be futile because of the lack of an adequate opportunity to challenge the tribal court's jurisdiction; (4) when it is plain that no federal grant provides for tribal governance of nonmembers' conduct on land covered by the main rule established in Montana v. United States, 450 U.S. 544 (1981); or (5) it is otherwise clear that the tribal court lacks jurisdiction so that the exhaustion requirement would serve no purpose other than delay.

Burrell, 456 F.3d at 1168 (quotations, alterations, and citations omitted). Stated differently, these exceptions generally apply if tribal court jurisdiction is

7

"automatically foreclosed." Nat'l Farmers, 471 U.S. at 855 (1985). A party seeking an exception bears the burden of "mak[ing] a substantial showing of eligibility." Thlopthlocco Tribal Town v. Stidham, 762 F.3d 1226, 1238 (10th Cir. 2014). Because our court "has taken a strict view of the tribal exhaustion rule," Kerr-McGee, 115 F.3d at 1507, "the exceptions are applied narrowly," Thlopthlocco, 762 F.3d at 1239. Exceptions typically will not apply so long as tribal courts can "make a colorable claim that they have jurisdiction." Id. at 1240.

## A

In considering whether tribal jurisdiction is "colorable," Thlopthlocco, 762 F.3d at 1240, we first emphasize that "Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory," United States v. Mazurie, 419 U.S. 544, 557 (1975). As "a separate people," tribes retain "those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status." United States v. Wheeler, 435 U.S. 313, 322-23 (1978) (quotation omitted).

In Montana, the Supreme Court confirmed that tribes retain the right "to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands." 450 U.S. at 565. But tribal civil jurisdiction generally does not extend to nonmembers, with two exceptions. Id. First, tribes retain the authority to regulate the "activities of nonmembers who enter consensual relationships with the tribe or its members." Id. Second, a tribe "may also retain inherent power to exercise civil authority over the conduct of non-Indians" if "that

8

conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." Id. at 566.[2]

We have previously held that Montana governs tribal civil jurisdiction over nonmembers on both Indian and non-Indian lands. MacArthur v. San Juan Cty., 497 F.3d 1057, 1069-70 (10th Cir. 2007). Although

> the nature of the property is a factor—and possibly a dispositive one—to consider in determining whether the [nonmember] activity falls within either of Montana's two exceptions, the only relevant characteristic for purposes of determining Montana's applicability in the first instance is the membership status of the individual or entity over which the tribe is asserting authority.

Id. at 1070 (citation omitted). Because the officers are nonmember defendants in the Tribal Court action, Montana applies to this case.

In Montana, the Supreme Court "readily agree[d]" that the tribe had jurisdiction to bar nonmembers from tribal land and recognized that the tribe may place conditions on nonmembers' entry onto tribal land over and above the authority that tribes have to regulate nonmember conduct on reservation land in general. 450 U.S. at 557. After Montana, the Court reaffirmed the principle that "a hallmark of

---

[2] As the varying language between "non-Indian" and "nonmember" in these quotes illustrates, the Supreme Court has not been clear about whether Montana's rules regarding tribal civil jurisdiction apply to all nonmembers or to only non-Indians (i.e., whether Montana limits a tribal court's civil jurisdiction over Indians who are members of a different tribe). See McDonald v. Means, 309 F.3d 530, 540 n.10 (9th Cir. 2002) (stating that because tribes can exercise criminal jurisdiction over all Indians regardless of membership, they can also exercise civil jurisdiction over nonmember Indians); id. at 545 (Wallace, J., dissenting) (noting that the Supreme Court has not "answered the question of tribal civil jurisdiction over nonmember Indians"). For consistency's sake, we generally use the term "nonmember" in discussing Montana and its progeny, but we do not reach a conclusion on this issue.

Indian sovereignty is the power to exclude non-Indians from Indian lands." Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 141 (1982). And it has looked to whether a tribe can "assert a landowner's right to occupy and exclude." Strate v. A-1 Contractors, 520 U.S. 438, 456 (1997). In Plains Commerce Bank, 554 U.S. 316 (2008), the Court emphasized that "[t]he status of the land is relevant insofar as it bears on the application of Montana's exceptions." Id. at 331 (quotation and alterations omitted). It stressed the "critical importance of land status" to its jurisdictional analysis, id. at 338, stating that tribal sovereignty "centers on the land held by the tribe and on tribal members within the reservation," id. at 327. The Court also reiterated that tribes may "exclude outsiders from entering tribal land." Id. at 328. In discussing the Montana exceptions, it stated that "the tribe's sovereign interests are now confined to managing tribal land, protecting tribal self-government, and controlling internal relations." Id. at 334 (quotations, citation, and alterations omitted). The regulations permitted in Montana "all flow directly from these limited sovereign interests." Id. at 335. "The tribe's 'traditional and undisputed power to exclude persons' from tribal land, for example, gives it the power to set conditions on entry to that land via licensing requirements and hunting regulations." Id. (quoting Duro v. Reina, 495 U.S. 676, 696 (1990)).

In light of these repeated confirmations of tribes' right to exclude nonmembers from tribal lands, we think it plausible that the Tribal Court possesses jurisdiction over the trespass claim. See Attorney's Process & Investigation Servs., Inc. v. Sac & Fox Tribe of Miss. in Iowa, 609 F.3d 927, 937 (8th Cir. 2010) ("Each claim must be

10

analyzed individually in terms of the <u>Montana</u> principles to determine whether the tribal court has subject matter jurisdiction over it."). The Court has described the right to exclude as within the regulatory, rather than adjudicative, authority of tribes. <u>See, e.g.</u>, <u>Plains Commerce Bank</u>, 554 U.S. at 335. But tribal court jurisdiction "turns upon whether the actions at issue in the litigation are regulable by the tribe." <u>Hicks</u>, 533 U.S. at 367 n.8. And "where tribes possess authority to regulate the activities of nonmembers, civil jurisdiction over disputes arising out of such activities presumptively lies in the tribal courts." <u>Strate</u>, 520 U.S. at 453 (quotation and alteration omitted).

In <u>Attorney's Process & Investigation Services</u>, the Eighth Circuit concluded that a tribal court possessed jurisdiction over a similar trespass claim. 609 F.3d at 940. There, a group of nonmembers, acting at the behest of a tribal government faction, forced their way into the tribe's casino and government offices. <u>Id.</u> at 932. The Eighth Circuit concluded that the tribe's trespass claim sought to regulate the nonmembers' "entry and conduct upon tribal land" and "accordingly stem[med] from the tribe's landowner's right to occupy and exclude." <u>Id.</u> at 940 (quotation omitted). Because the nonmembers' trespass on government offices "directly threatened the tribal community and its institutions," the court held that the actions "threatened the political integrity, the economic security, and the health and welfare of the Tribe." <u>Id.</u> at 939, 940 (quotation omitted).

Similarly, in <u>Elliott v. White Mountain Apache Tribal Court</u>, 566 F.3d 842 (9th Cir. 2009), the Ninth Circuit held that tribal exhaustion was necessary for a

11

trespass claim brought in tribal court against a nonmember who started a forest fire on the reservation. Id. at 849-50. "Trespass regulations plainly concern a property owner's right to exclude, and regulations prohibiting destruction of natural resources and requiring a fire permit are related to an owner's right to occupy." Id. at 850. Because the trespass destroyed the tribe's natural resources, the suit was "intended to secure the tribe's political and economic well-being" and thus fit within the second Montana exception. Id.

Returning to the case at bar, the alleged harm to the Tribe itself from the officers' trespass is arguably less severe than in Attorney's Process & Investigation Services and Elliott.[3] But as in Attorney's Process & Investigation Services, the Tribal Court complaint claims that the officers interfered with tribal authority over

_____

[3] The officers contend that we should review the facts in their federal court complaint under an ordinary motion to dismiss standard. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). However, the Tribal Plaintiffs argue that the Tribal Court complaint contains the relevant allegations. This dispute is immaterial to our disposition. The Tribal Court complaint is attached to the officers' federal complaint. We have recognized that "a document central to the plaintiff's claim and referred to in the complaint may be considered in resolving a motion to dismiss, at least where the document's authenticity is not in dispute." Utah Gospel Mission v. Salt Lake City Corp., 425 F.3d 1249, 1253-54 (10th Cir. 2005). Accordingly, we may consider the Tribal Court complaint in assessing the officers' claims to relief.

Whether the Tribal Court possesses jurisdiction necessarily turns on the allegations contained in the Tribal Court complaint. See Attorney's Process & Investigation Servs., 609 F.3d at 937 ("In analyzing the jurisdictional issue we rely on the record developed in the tribal courts and the allegations in the Tribe's complaint."). A key rationale underlying the tribal exhaustion requirement is to provide federal courts with "the benefit of a full factual record on the relevant issues and the benefit of tribal court expertise." Thlopthlocco, 762 F.3d at 1237. Underlining this purpose, federal review of tribal jurisdiction relies on the factual record developed in tribal court. See Mustang Prod. Co. v. Harrison, 94 F.3d 1382, 1384 (10th Cir. 1996) (reviewing tribal court's factual findings for clear error).

tribal trust lands. Specifically, it asserts that the officers prevented Wissiup, a tribal member and certified law enforcement officer, from accessing the site of the shooting or attending to Murray as he bled to death. Thus, in addition to impinging upon a "hallmark of Indian sovereignty" by trespassing, Merrion, 455 U.S. at 141, the officers colorably threatened the "political integrity" of the tribe, Montana, 450 U.S. at 566, by improperly asserting their own authority as superior to that of a tribal official on tribal lands.

The second Montana exception may be invoked only if the challenged conduct could "fairly be called catastrophic for tribal self-government." Id. at 341. We stress that we are not deciding today whether the Tribal Court possesses jurisdiction, but merely whether it can "make a colorable claim that [it has] jurisdiction." Thlopthlocco, 762 F.3d at 1240. It may well be that upon further examination, the Tribal Court lacks jurisdiction over the trespass claim. But we think it plausible that this claim fits within the second Montana exception. A power is an "essential attribute of Indian sovereignty" if it "is a necessary instrument of self-government and territorial management." Merrion, 455 U.S. at 137. The particular allegations of this trespass claim may qualify as a critical undermining of the Tribe's ability to engage in self-government and territorial management. Whether such allegations are sufficiently catastrophic would benefit from full consideration in the Tribal Court. See Kerr-McGee, 115 F.3d at 1507. Thus, we rule that the district court should abate further proceedings regarding this claim until the officers have exhausted Tribal

13

Court remedies. See Thlopthlocco, 762 F.3d at 1241 ("[A]batement of this action is preferable to dismissal pending exhaustion of tribal court remedies.").

We reach the opposite conclusion as to the remaining claims in the Tribal Court complaint. Although those claims—false imprisonment, false arrest, assault and battery, wrongful death, spoliation of evidence, and conspiracy—also arose on tribal land, they do not implicate the Tribe's core sovereign interest in excluding non-Indians from tribal lands, or any of the other tribal interests at stake in Montana's second exception.

In Strate, the Supreme Court held that a tribal court lacked jurisdiction over tort claims relating to a traffic accident brought by a nonmember and her children, who were tribal members, against nonmember defendants. 520 U.S. at 442-43. It stated that negligent drivers "endanger all in the vicinity, and surely jeopardize the safety of tribal members," but "if Montana's second exception requires no more, the exception would severely shrink the rule." Id. at 458. As a result, the Court concluded that the second Montana exception did not apply. Id. at 459 (quotation omitted).

As in Strate, the remaining Tribal Court claims concern actions that threatened an individual tribal member but do not threaten the Tribe as a whole. The sole distinction offered by the Tribal Plaintiffs is that their claims occurred on tribal lands, whereas the highway in Strate was analogous to non-Indian fee land. 520 U.S. at 456. Land status is a highly relevant concern, and in some cases, may be dispositive. MacArthur, 497 F.3d at 1069-70. But we are bound by our prior

14

precedent holding that <u>Montana</u> governs both Indian and non-Indian lands. <u>Id.</u> And

the Supreme Court has warned that "<u>Montana</u>'s second exception can be

misperceived." <u>Atkinson Trading Co. v. Shirley</u>, 532 U.S. 645, 657 n.12 (2001)

(quotation omitted). As the Ninth Circuit has explained:

> To some extent, it can be argued that torts committed by or against
> Indians on Indian land always threaten or have some direct effect on the
> political integrity, the economic security, or the health or welfare of the
> tribe. But this generalized threat that torts by or against its members
> pose for any society, is not what the second <u>Montana</u> exception is
> intended to capture.

<u>Philip Morris USA, Inc. v. King Mountain Tobacco Co.</u>, 569 F.3d 932, 943 (9th Cir.

2009) (quotation and alterations omitted). Without some plausible argument as to

how the remaining torts claims rise above this "generalized threat," we cannot hold

that the second <u>Montana</u> exception applies. <u>Id.</u>; <u>see</u> <u>MacArthur</u>, 497 F.3d at 1075.

The Tribal Plaintiffs also refer us to <u>Williams v. Lee</u>, 358 U.S. 217 (1959), in

which a nonmember plaintiff sued tribal members for actions that occurred on Indian

lands. <u>Id.</u> at 217-18. We agree with the Ninth Circuit, however, that the party status

of the nonmember is relevant. <u>See</u> <u>Philip Morris USA</u>, 569 F.3d at 940. When a

nonmember plaintiff sues a tribal member defendant, the suit in effect seeks to

regulate the tribal member, implicating the "right of the Indians to make their own

laws and be governed by them." <u>Hicks</u>, 533 U.S. at 361. Accordingly, "<u>Williams</u>

makes clear that tribal courts have exclusive jurisdiction over suits against tribal

members on claims arising on the reservation." <u>Philip Morris USA</u>, 569 F.3d at 940.

Yet when a tribal member hales a nonmember into tribal court as a defendant, a

15

tribe's interest in self-government is less direct because the suit concerns nonmember conduct.  See id.; see also MacArthur, 497 F.3d at 1075 (no tribal jurisdiction because the right at issue was that of the tribe "to make its own laws and have others be governed by them, not the right to self-government").  In Strate, the Court specifically framed the issue as "the adjudicatory authority of tribal courts over personal injury actions against defendants who are not tribal members."  520 U.S. at 442.

Although we conclude that exhaustion is necessary for the trespass claim, the Tribal Plaintiffs have not set forth a theory under which their remaining claims are plausibly subject to a Montana exception.[4]  Therefore, we conclude that tribal exhaustion of those claims is not required.

**B**

Notwithstanding the Tribe's right to exclude, the district court concluded that Hicks bars tribal jurisdiction over all of the Tribal Plaintiffs' claims.  In Hicks, the Supreme Court did not require exhaustion because it was "clear" that tribes lack authority over state law enforcement officers executing search warrants related to off-reservation crime.  533 U.S. at 374.  Although the cause of action against the officers arose on tribal land, the Court rejected the notion that this status alone afforded the tribe jurisdiction over the nonmember officers.  Id. at 360.  The Hicks opinion acknowledges "that tribal ownership is a factor in the Montana analysis, and

_____

[4] The Tribal Plaintiffs do not argue that the first Montana exception, concerning consensual relationships, applies to these claims.

16

a factor significant enough that it may sometimes be dispositive." Id. at 370 (quotation and alteration omitted). But tribal ownership was not dispositive in Hicks because "the State's interest in pursuing off-reservation violations of its laws," id., outweighed tribes' sovereign right to "make their own laws and be governed by them," id. at 361.

Notably, the Hicks Court expressly limited its holding to "the question of tribal-court jurisdiction over state officers enforcing state law" and left open the issue of tribes' civil jurisdiction over nonmember defendants generally. Id. at 358 n.2; see also id. at 371 (noting that the case concerned only a "narrow category of outsiders"). Thus, the question before us is whether this case sufficiently mirrors Hicks so as to compel its narrow holding to apply. Again, we do not decide if the Tribal Court ultimately possesses civil jurisdiction over the officers, but rather if the officers have met their present substantial burden to show that the Tribe's lack of jurisdiction is "so patently obvious as to defy exhaustion." Thlopthlocco, 762 F.3d at 1239. We conclude that they have not.

The facts in this case differ from those in Hicks in a critical way: there is no claim that Murray was suspected of committing an off-reservation crime. Although the driver was speeding outside of the Reservation, Murray was merely a passenger. To the extent that Murray's running away from State Trooper Swenson could be considered an offense, see Utah Code § 41-6a-209 (disobeying a lawful order of a law enforcement officer), this crime does not fit within Hicks' confines. Murray fled on tribal lands. Cf. Hicks, 533 U.S. at 364 (involving an off-reservation crime).

17

When the officers began chasing Murray on foot, the driver of the vehicle had already been apprehended. It is not clear from the existing record whether the officers' pursuit of Murray constituted a continuation of the prior chase or an independent search. See generally Welsh v. Wisconsin, 466 U.S. 740, 753 (1984) (hot pursuit doctrine requires an "immediate or continuous" chase of a suspect from a crime scene); see also Stanton v. Sims, 134 S. Ct. 3, 6 (2013) (per curiam) (hot pursuit doctrine does not apply to a suspect who "had escaped from the police 30 minutes prior and his whereabouts were unknown").

Further, the officers—who were not cross-deputized to enforce state law on the Reservation—did not possess criminal jurisdiction over Murray for any on-reservation offense. See Ross v. Neff, 905 F.2d 1349, 1352 (10th Cir. 1990) (absent a special grant of jurisdiction, states lack authority over crimes by tribal members committed in Indian country); see also Ute Indian Tribe of the Uintah & Ouray Reservation v. Utah, 790 F.3d 1000, 1004 (10th Cir. 2015) (Utah has not been granted jurisdiction to prosecute Indians for offenses in Indian country); cf. Hicks, 533 U.S. at 362 (noting that states have criminal jurisdiction over Indians for crimes committed off the reservation). In Hicks, the state officials acted in concert with tribal authorities on a tip from a tribal police officer, and they secured a tribal court warrant prior to the challenged search. 533 U.S. at 356. Those circumstances are plainly absent in this case. Given that the chief concern driving the Court in Hicks was the state's paramount interest in investigating off-reservation crimes, id., we

18

cannot say that a similar state interest is implicated when state officers pursue a tribal member on tribal land for an on-reservation offense over which they lack authority.

## C

The officers also argue that the Tribal Plaintiffs filed their suit with a desire to harass or in bad faith. See Burrell, 456 F.3d at 1168. Although the bad faith exception language from National Farmers does not indicate who it is that must act in bad faith, see 471 U.S. at 856 n.21, we agree with the Ninth Circuit that "the interpretation most faithful to National Farmers is that it must be the tribal court that acts in bad faith to exempt the party from exhausting available tribal court remedies," Grand Canyon Skywalk Dev., LLC v. 'Sa' Nyu Wa Inc., 715 F.3d 1196, 1201 (9th Cir. 2013).

This exception was imported from Juidice v. Vail, 430 U.S. 327 (1977). There, the Court concluded that a state proceeding was not conducted in bad faith even if the plaintiffs acted in bad faith because there were no such "allegations with respect to appellant [state court] justices who issued the contempt orders." Id. at 338. The bad faith exception "may not be utilized unless it is alleged and proved that they [the state court justices] are enforcing the contempt procedures in bad faith or are motivated by a desire to harass." Id. The Ninth Circuit explained that, under a contrary reading, "[a] party would need only allege bad faith by the opposing party, or a third party, to remove the case to federal court." Grand Canyon Skywalk, 715 F.3d at 1201. "Comity principles require that we trust that our tribal court counterparts can identify and punish bad faith by litigants as readily as we can." Id.

19

Because the officers do not allege bad faith on the part of the Tribal Court, that exception does not apply to this case.

We also reject the officers' arguments that they will suffer undue bias and a lack of due process if subjected to tribal jurisdiction. The officers offer little support for their allegations, which boil down to baseless "attacks" on the competence and fairness of the Ute Tribal Court. Iowa Mut. Ins, 480 U.S. at 19. The Supreme Court has already explained that such arguments are contrary to federal policy and thus have no bearing on our tribal exhaustion analysis. See id.; see also Burrell, 456 F.3d at 1168 ("Allegations of local bias and tribal court incompetence . . . are not exceptions to the exhaustion requirement."). The Court has also "repeatedly" recognized tribal courts "as appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians." Santa Clara Pueblo v. Martinez, 436 U.S. 49, 65 (1978) (emphasis added); see Wheeler, 435 U.S. at 332 ("[T]ribal courts are important mechanisms for protecting significant tribal interests.").

Although it is true that the Bill of Rights does not itself constrain tribal court proceedings, see Talton v. Mayes, 163 U.S. 376, 382-85 (1896), this does not leave the rights of nonmembers unprotected in tribal courts. The Indian Civil Rights Act ("ICRA"), 25 U.S.C. §§ 1301-04, expressly provides that no tribe may "deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law." § 1302(a)(8) (emphasis added). See

20

also <u>Iowa Mut. Ins.</u>, 480 U.S. at 19 (noting that ICRA "provides non-Indians with various protections against unfair treatment in the tribal courts").

Making good on these due process guarantees, nearly five decades of tribal cases applying ICRA show that tribal courts protect the rights of both member and nonmember litigants in much the same way as do federal and state courts. <u>See</u> Matthew L.M. Fletcher, <u>Indian Courts and Fundamental Fairness: Indian Courts and the Future Revisited</u>, 84 U. Colo. L. Rev. 59, 75 (2013) (in a 2008 study, "[o]f the 120 cases involving an ICRA issue, tribal court judges cited federal and state case law as persuasive (and often controlling law) in 114 cases (95 percent)"). And tribal courts often provide litigants with due process that "exceed[s] the protections offered by state and federal courts." Matthew L.M. Fletcher, <u>American Indian Tribal Law</u> 325 (2011). Moreover, empirical studies demonstrate that tribal courts are even-handed in dispensing justice to nonmembers. <u>See, e.g.</u>, Bethany R. Berger, <u>Justice and the Outsider: Jurisdiction Over Nonmembers in Tribal Justice Systems</u>, 37 Ariz. St. L.J. 1047, 1047 (2005) ("Navajo appellate courts are remarkably balanced in hearing cases involving outsiders . . . [and this finding] is supported by a more limited review of decisions by other tribal courts."); Mark D. Rosen, <u>Multiple Authoritative Interpreters of Quasi-Constitutional Federal Law: Of Tribal Courts and the Indian Civil Rights Act</u>, 69 Fordham L. Rev. 479, 578 (2000) (concluding from a study of twelve years of decisions from approximately twenty-five tribal courts that

"tribal courts have [not] succumbed to the temptation to favor the insider at the expense of outsiders").[5]

## III

District court denial of a motion to dismiss based on tribal sovereign immunity is subject to interlocutory appellate jurisdiction. See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort, 629 F.3d 1173, 1177 n.1 (10th Cir. 2010). We

---

[5] The officers assert two additional arguments in conclusory fashion. First, they state that tribal exhaustion is not necessary based on an "express jurisdictional prohibition[]." Burrell, 456 F.3d at 1168 (quotation omitted). But they fail to identify any such provision. "We do not consider unsupported and undeveloped issues." Moore v. Gibson, 195 F.3d 1152, 1180 n.17 (10th Cir. 1999).

Second, the officers argue that the Utah Governmental Immunity Act ("UGIA") and/or sovereign immunity shield them from suit in Tribal Court. But their cursory discussion of these immunities falls far short of the "substantial showing of eligibility" for an exception to the general tribal exhaustion rule that our precedent requires. Thlopthlocco, 762 F.3d at 1238. As with the officers' other arguments, we conclude they have not shown that sovereign immunity or the UGIA prevent the Tribal Court from making a "colorable claim" of jurisdiction. Thus, their arguments should be addressed first to the Tribal Court, even if they ultimately prove valid. Id. at 1240.

Sovereign immunity does not bar claims against a state officer sued in his individual capacity as long as the relief sought would not operate against the sovereign. See Cornforth v. Univ. of Okla. Bd. of Regents, 263 F.3d 1129, 1133-34 (10th Cir. 2001). And it is unclear whether the UGIA applies in Tribal Court with respect to nonmembers who commit torts on tribal land. The Supreme Court has held that state governmental immunity acts do not govern conduct occurring in another state. See Nevada v. Hall, 440 U.S. 410, 414, 426 (1979). The analysis for Indian land differs in some respects. The Court has stated that in determining whether "state law [can] be applied on Indian reservations," we must consider "whether the application of that law would interfere with reservation self-government." Organized Vill. of Kake v. Egan, 369 U.S. 60, 67-68 (1962). For the reasons stated supra, the Tribe's interest in protecting its right to exclude may qualify as necessary for self-government. Although at least one district court decision has held that the UGIA does apply on tribal land, MacArthur v. San Juan Cty., 391 F. Supp. 2d 895, 1036-37 (D. Utah 2005), we conclude the issue is reasonably debatable such that tribal exhaustion is not excused.

22

review a district court's denial of tribal sovereign immunity de novo.  Miner Elec., Inc. v. Muscogee (Creek) Nation, 505 F.3d 1007, 1009 (10th Cir. 2007).

In Crowe & Dunlevy, we concluded that tribal sovereign immunity is subject to the Ex Parte Young exception for suits against tribal officials "seeking to enjoin alleged ongoing violations of federal law."  640 F.3d at 1154.  We held that the exception extended to suits seeking to enjoin "unlawful exercise of tribal court jurisdiction."  Id. at 1155.  The district court relied on Crowe & Dunlevy in denying sovereign immunity to Reynolds and the Tribal Court.  It did not specifically address whether the remaining defendants were entitled to sovereign immunity but denied their motion to dismiss.  We agree that Reynolds falls squarely within the Ex Parte Young exception.  He is a tribal official, sued in his official capacity, in a suit seeking to halt an allegedly unlawful exercise of tribal court jurisdiction.  Id.

Although the Ex Parte Young doctrine permits suits against officials, it "has no application in suits against the States and their agencies, which are barred regardless of the relief sought."  P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993); see also Higganbotham v. Okla. ex rel. Okla. Transp. Comm'n, 328 F.3d 638, 644 (10th Cir. 2003) (Ex Parte Young exception did not apply because "the plaintiff has directly sued the state and its agencies seeking declaratory and injunctive relief"); Buchwald, 159 F.3d at 496 (although Ex Parte Young does not permit suit against "state agencies, plaintiff may maintain an action against the individual defendants in their official capacities").

23

Applying those principles, we conclude that the Tribe, its Business Committee, and the Tribal Court are not subject to the Ex Parte Young exception because the complaint asserts claims against those tribal entities rather than their constituent officials.[6] As with a state and its agencies, the Tribe and its subdivisions may not be sued in the same manner as its officials. See Native Am. Distrib. v. Seneca-Cayuga Tobacco Co., 546 F.3d 1288, 1292 (10th Cir. 2008) ("Tribal immunity extends to subdivisions of a tribe . . . ."). The officers have not suggested that tribal sovereign immunity has been waived or abrogated by Congress. See Kiowa Tribe of Okla. v. Mfg. Techs., Inc., 523 U.S. 751, 754 (1998). Accordingly, we conclude that the Tribe, its Business Committee, and the Tribal Court are entitled to tribal sovereign immunity.[7]

**IV**

Because Tribal Court jurisdiction over the Tribe's trespass claim is colorable, we hold that the officers may not seek to enjoin that claim prior to exhausting Tribal Court remedies. However, we agree with the district court that tribal exhaustion is not required for the remaining claims in the Tribal Court complaint. We further conclude that the Tribe, its Business Committee, and the Tribal Court are entitled to

_____

[6] As noted above, the district court did not expressly rule whether the Tribe and its Business Committee are entitled to tribal sovereign immunity. However, those entities incorporated the arguments raised by Reynolds and the Tribal Court in their motion to dismiss, which the district court denied. We thus conclude the denial of immunity to the Tribe and its Business Committee is properly before us.

[7] The Tribe and its Business Committee also argue that the district court incorrectly denied their motion to dismiss based on improper service. Our sovereign immunity ruling obviates the need to address that issue.

24

tribal sovereign immunity, but that Reynolds is not so entitled under the Ex Parte

Young exception.  Accordingly, we **VACATE** the district court order granting a

preliminary injunction and denying the defendants' motions to dismiss.  We

**REMAND** for further proceedings consistent with this opinion.